**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

LINDA BARRICK, et al.

       Plaintiffs,

   v.

PENN NATIONAL GAMING, INC. and
PNGI CHARLES TOWN GAMING, LLC
d/b/a HOLLYWOOD CASINO AT CHARLES
TOWN RACES,

       Defendants.

Civil Action No. 3:17-CV-138
Judge Groh

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT

Defendants, Penn National Gaming, Inc.[1] and PNGI Charles Town Gaming, LLC d/b/a Hollywood Casino at Charles Town Races ("Hollywood Casino") (collectively, "Defendants"), pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, submit this memorandum of law supporting their Motion for Summary Judgment. The facts presented in this memorandum are entirely undisputed. Applying these undisputed facts to a plain reading of the applicable statutes, regulations, and analogous case law culminates in a single, undeniable legal conclusion: Hollywood Casino's tip pool is in full compliance with the Fair Labor Standards Act ("FLSA") and all other applicable laws cited in Plaintiff Linda Barrick's ("Plaintiff") Complaint. Simply put, Plaintiff admits that each and every penny contributed to Hollywood Casino's dealer tip pool is collected and totaled according to well-known policies, and ultimately distributed only to hourly table games dealers, all of whom customarily and regularly receive tips.

---

[1] Penn National Gaming, Inc. is not a proper Defendant in this matter, as Plaintiff is and was at all relevant times an employee of PNGI Charles Town Gaming, LLC d/b/a Hollywood Casino at Charles Town Races.

The narrow issue presented in Plaintiff's Second Amended Complaint[2] – that the distribution of certain funds from the daily tip pool to table games dealers who scheduled paid time off ("PTO") is somehow improper – is completely without merit. In fact, despite the allegations in her Second Amended Complaint, Plaintiff admitted in her deposition that including a fixed PTO payment from the tip pool is a "good thing," that she never complained about the tip pool policy in any way prior to filing this litigation, and that she was <u>never</u> denied a PTO distribution from the tip pool when she followed Hollywood Casino's well-known policy for scheduling PTO in advance. Hollywood Casino's tip pooling policy complies with the FLSA, the West Virginia Wage Payment and Collection Act, and West Virginia common law in every way. Therefore, under Rule 56(c) of the Federal Rules of Civil Procedure, this Court must dismiss Plaintiff's Second Amended Complaint in its entirety with prejudice.

## I.     STATEMENT OF FACTS

### A.   <u>The Parties</u>

Hollywood Casino is a race track and casino located outside the eastern city limits of Charles Town, West Virginia. Plaintiff Linda Barrick is currently employed as a table games

---

[2] Plaintiff's original Complaint was filed on November 8, 2017 and alleged, in pertinent part, that on days when Hollywood Casino's tip pool generates a large amount of tips, Hollywood Casino improperly and illegally "remove[s] some portion of the funds from the tip pool to finance payment of future paid time off, which Plaintiff and other similarly-situated employees may or may not eventually receive." *See* ECF Doc. No. 1, at ¶ 5. Plaintiff alleged that this practice does not permit employees to retain all of their tips, in violation of the FLSA, the WPCA, and in breach of an enforceable contract between the parties. On December 29, 2017, before the filing of Defendants' answer, Plaintiff filed her First Amended Complaint, adding two new legal theories. Thereafter, after having been provided with information irrefutably disproving Plaintiff's original theory, Plaintiff filed her Second Amended Complaint on January 31, 2018. Notably, Plaintiff's Second Amended Complaint removed her original inaccurate allegations regarding Defendants not distributing the tip pool funds and "skimming" tips to "fund future PTO."

Plaintiff's evolving Complaint in this matter is consistent with Plaintiff and her family's extensive history of litigious conduct against Hollywood Casino. In addition to this litigation, Plaintiff was also a named Complainant, along with her son Michael, in an administrative charge with OSHA, alleging violations of the whistleblower protection provisions of the Sarbanes-Oxley Act. Plaintiff also filed an administrative charge against Hollywood Casino which was dismissed by the Equal Employment Opportunity Commission alleging disability discrimination, failure to accommodate, and hostile work environment. Tellingly, Plaintiff admitted in her deposition that the first time she ever made a complaint of any kind about Hollywood Casino's tip pooling practices was when she filed the Complaint in this case, and that the Complaint in this case was only filed after Plaintiff's son Michael had been discharged from his employment at Hollywood Casino. *See* **Exhibit 1** at 57.

dealer by Hollywood Casino. *See* Deposition Transcript of Linda Barrick, at 8-9, attached hereto as **Exhibit 1**. She has been employed in that role at Hollywood Casino since 2011. *Id.*

**B.**     **Hollywood Casino's PTO Policy**

All eligible full-time and part-time employees of Hollywood Casino are provided with substantial paid time off benefits that can be used for vacation, holidays, sick days, and/or other personal reasons. *See* PTO Policy, at PNGI/LB 000001-2, attached hereto as **Exhibit 2**. Under Hollywood Casino's PTO policy, full-time employees accumulate PTO based on continuous length of service and regular hours worked, up to a maximum of 240 hours. *Id.*; *see also* **Exhibit 1** at 60-61. With regard to scheduling PTO, Hollywood Casino's policy states as follows:

> Every effort will be made to accommodate the Team Member's request for PTO. However, PTO will be scheduled based upon the mutual needs of the individual, the department and the Company. . . . "Authorized PTO" is PTO used with prior notice and management approval. PTO requests must be submitted to the appropriate department manager in accordance with the specific department guidelines for advance notice for time off.

**Exhibit 2** at PNGI/LB 000003. As reflected in the PTO policy, each department at Hollywood Casino has its own guidelines reflecting how far in advance PTO must be requested to be considered Authorized PTO. *See* **Exhibit 1** at 94. With regard to the table games department, of which Plaintiff is a member, 14 or more days of advance notice is required for PTO to be considered Authorized PTO under the policy. *Id.*

Plaintiff plainly admitted in her deposition that neither she, nor any other employee that she is aware of, has ever been denied Authorized PTO when it was requested in accordance with the table games department's 14-day advance notice guideline. In that regard, Plaintiff testified as follows:

> Q.     . . . Have you ever been denied PTO when you requested at least –
> when you requested it at least 14 days or more in advance?
> A.     Don't know.

> Q.    Okay. Can you – as you sit here today, can you give me the name of a single person that you work with, that you're aware of, that has been denied PTO if they requested it 14 days or more in advance?
>
> A.    In advance, no.
>
> Q.    All right.
>
> A.    Not that I know of.

*Id*. at 95-96. As Plaintiff admitted in her deposition, there is no factual dispute that if a table games dealer requests PTO 14 days or more in advance, in accordance with Hollywood Casino's policy, it will be granted and considered Authorized PTO under the policy. *Id*. Thus, as reflected in Plaintiff's own sworn testimony, Hollywood Casino's PTO policy is abundantly clear, well-known and widely distributed among all table games dealers, and applied equally and in a non-arbitrary manner by Hollywood Casino. *Id*. at 60-63, 93-96.

## C.    Hollywood Casino's Tip Pooling Policies and Procedures

### 1.    General Tip Pool Structure

Table games dealers at Hollywood Casino, such as Plaintiff, are compensated based on an hourly rate of pay, plus dealer tips, also known as "tokes." *Id*. at 9. When a customer gives a dealer a toke, either in the form of a gaming chip or cash[3], the dealer immediately deposits the toke into a locked toke box attached to the gaming table. *Id*. at 14-15; *see also* Acceptance and Distribution of Tips Policy, at ¶ 3, attached hereto as **Exhibit 3** ("Upon receipt from a patron of a tip or gratuity, a Dealer shall extend his or her arm in an overt motion, and deposit such tip or gratuity in the locked box reserved for such purpose. . . ."). Importantly, under Hollywood Casino's policy, "[n]o Hollywood Casino management employee, Boxperson, floorperson, or any other employee who serves in a Supervisory position shall solicit or accept . . . any tip or gratuity from any player or patron of the gaming facility where he or she is employed." *Id*. at ¶ 1.

---

[3] Cash tips are converted to gaming chips before being placed in the locked toke box. *Id*. at 11-13.

Indeed, Plaintiff admitted in her deposition that such policy was followed in practice at Hollywood Casino. **Exhibit 1** at 16.

To ensure dealer tokes are fairly distributed among the table games dealers working on any given day, and to avoid issues such as table games dealers fighting for specific gaming tables or high-tipping customers, Hollywood Casino has implemented a tip pooling policy.[4] *Id.* at 48. Under the tip pooling policy, only hourly table games dealers (who are all regularly tipped employees) participate in the tip pool.[5] Tokes are placed "in a common pool for complete distribution pro rata for each respective day of the week among all Dealers, with the distribution based upon the number of hours each Dealer has worked for each respective day of the week." *See* **Exhibit 3** at ¶ 2.c.

### 2.    Counting and Verifying Tips by the Toke Committee

To ensure the integrity of the tip pool, a team of volunteer table games dealers, known as the "toke committee," which does not include any member of management, oversees the collection, counting, and verification of the toke pool at the conclusion of each gaming day. *See* **Exhibit 1** at 19-23. The gaming day at Hollywood Casino runs for a continuous 24-hour period, and includes three shifts. *Id.* at 35-36. A "toke administrator," who is elected by and from Hollywood Casino's pool of full-time table games dealers, oversees and coordinates this process. *See* Hollywood Casino Toke Policy, attached hereto as **Exhibit 4**. Also participating in the

---

[4] The tip pooling policy, as explained in detail below, specifically allows table games dealers who are on Approved PTO to participate in the tip pool. This aspect of the tip pool is explained in greater detail in Section I.C.3, below.

[5] *See* **Exhibit 1** at 16, which states, in relevant part:

| | |
|---|---|
| Q. | All right. And to the best of your recollection, based on what you know, that's how it works in practice. No member of management or anybody that is a supervisor participates in the tip pool; is that accurate? |
| A. | Correct. |
| Q, | So the tip pool is reserved solely for hourly dealers? |
| A. | Yes. |
| Q. | In the table games department? |
| A. | Yes. |

process are designated counters and verifiers who perform the actual count and then confirm the accuracy of the toke count before depositing it. *Id*. Any hourly table games dealer has the opportunity to elect to serve as a counter or verifier on the toke committee. *Id*.; *see* **Exhibit 1** at 22. Plaintiff testified that she has never volunteered to serve as a verifier or counter. *See* **Exhibit 1** at 23. Again, the toke administrator, counters, and verifiers are all hourly table games dealers who participate in the tip pool. *Id*. at 21-22; 30.

Once the toke committee counts and verifies the total toke for that gaming day, the toke collection – in the form of cash and/or gaming chips – is deposited with the casino cage, and the amount of the toke deposit for that gaming day is reported to Hollywood Casino's accounting department. *Id*. at 27, 32, 36; *see also* Sample Hollywood Casino Table Games Toke Count and Deposit Slip and Daily Toke Counting Sign-Up Sheet, attached hereto as **Exhibit 5**.

### 3. Distributing the Tip Pool and Inclusion of Scheduled PTO Hours

After the toke count is finalized for a gaming day by the toke committee, the amounts to be distributed to each eligible employee are calculated pursuant to a standard process and formula. The first step in the process of dividing the tip pool is to compute the total number of "hours worked" by all eligible employees for that gaming day. Included in this calculation are: (1) the actual number of hours worked by hourly table games dealers, on all three shifts, for that gaming day; (2) hours spent working as a counter or verifier for that gaming day – a counter is credited with 1 hour worked and a verifier is credited with 1.5 hours worked; and (3) the number of hours of scheduled PTO for that gaming day. *See* **Exhibit 1** at 36-37; *see also* **Exhibit 4**. To ensure its tip pool operates in a fair, equitable, and efficient manner, compliant with all applicable laws, Hollywood Casino has established this specific standard for calculating and distributing the daily tip pool, which includes scheduled PTO hours. This is consistent with Hollywood Casino's Acceptance and Distribution of Tips Policy, which states, in relevant part:

> In determining the number of hours which an employee has worked for purposes of tip pool distribution, **Hollywood Casino may establish standards for distribution which include hours of** vacation time, **personal leave time**, or any other authorized leave of absence in the number of hours worked by each employee. **Any such standards shall apply uniformly to all employees**, except that Hollywood Casino may establish different standards for full-time and part-time employees.

*See* **Exhibit 3** at ¶ 4 (emphasis added).

In order to be considered "scheduled PTO" for toke pool participation, PTO must have been scheduled in advance and pursuant to Hollywood Casino's PTO policy, discussed *supra*. *See* **Exhibit 4** ("PTO hours for full time dealers will be paid at your hourly rate + $10 per hour taken from each PTO day's toke pool. PTO days must be scheduled in advance."); *see also* **Exhibit 1** at 38. In other words, PTO used for call-offs, early outs, or other unscheduled absences would not be included in the hours worked calculation for the toke pool, and thus no toke payment is made for such unscheduled PTO hours. **Exhibit 1** at 59-60. Notably, the policy of including scheduled PTO in the toke pool calculation benefits the dealers by allowing the dealers to take scheduled time off while maintaining a steady of stream of income and, at the same time, ensuring that the toke pool is not unevenly drained by unscheduled absences.

After the total hours worked calculation is completed, the individual shares of the toke pool are calculated pursuant to a similar, standard formula. First, the toke administrator receives a flat rate of $150.00 from the toke pool per payroll period for his or her services. *See* **Exhibit 4**. This results in a flat payment of $10.71 per gaming day (*i.e.*, the $150.00 rate divided by the 14-day payroll period), in addition to any other toke payments to which he or she may be entitled. *Id*. Individuals who had scheduled PTO for that gaming day are paid a flat rate of $10.00 per hour from that gaming day's toke pool (in addition to the statutory hourly wage that is paid to them by Hollywood Casino). *Id*.; *see also* **Exhibit 1** at 39. The flat rate amounts for the toke

administrator and scheduled PTO payments are deducted from the overall toke amount each day.[6]

The remainder of the toke amount for that gaming day (after the toke administrator and PTO flat rate amounts are deducted) is then divided by the sum of the number of hours actually worked by all dealers for that gaming day and the number of hours credited for service as a counter or verifier. *Id*. at 37-39. This calculation results in an hourly toke rate applicable to that gaming day. *Id*. Each employee's individual share of the tip pool is then calculated by multiplying his or her total number of hours worked (including hours credited for serving as a counter or verifier, if applicable) by the hourly toke rate. *Id*. Each employee's share is paid out through normal payroll channels on the next regularly scheduled payday. *Id*. at 37; *see also* Tip Reporting Policy, at PNGI/LB 000009, attached hereto as **Exhibit 6**. The end result is that every last cent of the toke collection for each gaming day is fully distributed to the employees who are entitled to participate in the tip pool for that gaming day. In other words, Hollywood Casino does not retain or withhold any amount whatsoever from the tip pool – a fact Plaintiff readily admits.

## II.        LEGAL STANDARD

The Federal Rules of Civil Procedure state that summary judgment is proper if "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" demonstrate there is no genuine issue of material fact.

---

[6] *See* **Exhibit 1** at 39, which states, in relevant part:

> Q.     All right. And so when they're calculating the – the – the toke pool, they'll take the total, and then anybody that's on PTO, they'll get their flat $10 an hour from the toke pool for each hour they have PTO; is that accurate?
> A.     Yes.
> Q,     Okay. And then the remainder of the toke pool will be used to calculate that toke rate for the day; correct?
> A.     Correct.

Fed. R. Civ. P. 56(c). A party can also establish that there is no genuine issue of material fact by showing "that an adverse party cannot produce admissible evidence to support the fact." *Id.* The moving party must satisfy its burden by demonstrating that the record contains no evidence to support an essential element of a nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321-24 (1986), *cert. denied*, 484 U.S. 1066 (1988).

Once the moving party has shown the absence of any genuine issue of material fact, the nonmoving party must show the Court specific facts establishing a genuine issue for trial. *Precision Piping & Instr., Inc. v. E.I. du Pont de Nemours & Co.*, 707 F. Supp. 225, 228 (S.D. W. Va. 1989) (citing *Celotex*, 477 U.S. at 323). The nonmoving party must go beyond the pleadings and, by its own affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. The mere allegations or denials of a pleading, and broad assertions by a party alone, are not enough to create a factual dispute which will overcome a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Rather, the nonmoving party must present evidence that material facts – not just any facts – are in dispute. *Celotex*, 477 U.S. at 322-23. "[W]here the record taken as a whole cannot lead a rational trier of fact to find for the nonmoving party, there is 'no genuine issue for trial'" and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)).

## III.     ARGUMENT

### A.     Plaintiff's FLSA Claim Fails as a Matter of Law.

Plaintiff's primary cause of action in this matter, identified in the Second Amended Complaint as Count III, asserts that Hollywood Casino's tip pooling policies violate the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. Notably, Plaintiff's FLSA allegations

have evolved over the various iterations of her Complaint (*compare* ECF Doc. No. 1, Doc. No. 14, and Doc. No. 17). Even in Plaintiff's most recent Second Amended Complaint, not only are the two general theories supporting Plaintiff's FLSA claim not supported by law, but they are internally inconsistent and simply cannot be legitimately reconciled with one another. *See* Second Amended Complaint at ¶¶ 4-5. In fact, the legal theories espoused by Plaintiff in support of her FLSA claims are entirely novel in nature[7], and have never been endorsed by any federal district or appellate court. Because there is no genuine issue of material fact with regard to either of Plaintiff's two FLSA legal theories, summary judgment on her FLSA claim should be granted as a matter of law.

> **1.    All Hollywood Casino employees participating in the tip pool are persons who "customarily and regularly receive tips."**

Plaintiff's first theory in support of her FLSA claim is that Hollywood Casino's table games dealers who are on scheduled PTO and not working are not persons who "customarily and regularly receive tips," and therefore including them in the tip pool is a violation of the FLSA. *See* Second Amended Complaint at ¶ 5. However, a plain reading of the FLSA and its associated regulations leads to a contrary conclusion. The fact that an employee uses scheduled PTO does not strip that employee of his or her status as an individual who "customarily and regularly receives tips" as defined by 29 C.F.R. § 531.57.

Mandatory tip pooling arrangements are a well-recognized – and statutorily-sanctioned – exception to the general rule that all tips received by an employee shall be retained by that employee. In that regard, 29 U.S.C. § 203(m) states, in relevant part:

> An employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit.

---

[7] The novelty of Plaintiff's claims is illuminated by the fact that the two theories supporting her current lawsuit were not even brought in her original Complaint.

>The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, ***except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.***

29 U.S.C. § 203(m)(2)(ii)(B) (emphasis added). As defined by 29 U.S.C. § 203(t), a "tipped employee" is "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." As such, a tip pool will be deemed valid so long as it includes only employees who "customarily and regularly receive tips." *See* 29 C.F.R. § 531.54 ("Section 3(m) does not impose a maximum contribution percentage on valid mandatory tip pools, which can only include those employees who customarily and regularly receive tips."); *Montano v. Montrose Rest. Assocs., Inc.*, 800 F.3d 186, 189 (5th Cir. 2015). "Customarily and regularly" means:

>The employee must receive more than $30 a month in tips "customarily and regularly" in the occupation in which he is engaged in order to qualify as a tipped employee under section 3(t). If it is known that he always receives more than the stipulated amount each month, as may be the case with many employees in occupations such as those of waiters, bellhops, taxicab drivers, barbers, or beauty operators, the employee will qualify and the tip credit provisions of section 3(m) may be applied. . . . The phrase "customarily and regularly" signifies a frequency which must be greater than occasional, but which may be less than constant. If an employee is in an occupation in which he normally and recurrently receives more than $30 a month in tips, he will be considered a tipped employee even though occasionally because of sickness, vacation, seasonal fluctuations or the like, he fails to receive more than $30 in tips in a particular month.

29 C.F.R. § 531.57.

When courts assess whether an employee "customarily and regularly" receives tips, they look to whether the employee's job is historically a tipped occupation and whether he has more than "de minimis" interaction with customers as a part of his employment. *Chhab v. Darden*

*Rests., Inc.*, 2013 U.S. Dist. LEXIS 135926, *17-18. Clearly, hourly table games dealers[8] at Hollywood Casino meet this definition.

In fact, Plaintiff admitted during her deposition that she and all other table games dealers at Hollywood Casino regularly receive at least $30 per month in tokes. She testified as follows:

> Q.    . . . Do you regularly receive at least $30 per month in tokes?
> A.    Yes.
> Q.    Okay. Has – have you ever had a month where you have worked at Hollywood Casino where you did not receive at least $30 per month [in tokes]?
> A.    No.
> . . .
> Q.    Okay. And would that be the case for other table games dealers as well?
> A.    Yes.
> Q.    Okay. Are you aware of any table games dealers that would make less than $30 a month in tokes?
> A.    No. All tokes should be the same.

*Id.* at 50-54.

The plain language of the statutory definition of "customarily and regularly" makes it clear that simply being out on PTO does ***not*** render an employee ineligible to participate in a tip pool. To the contrary, the statutory definition specifically states that "sickness, [and] vacation," do not affect an employee's tip pool eligibility. *See* 29 C.F.R. § 531.57. As discussed above, every cent from the dealer toke pool is distributed to hourly table games dealers who regularly receive more than $30 a month in tips. Taking a day of PTO simply does not transform a dealer from a "tipped employee" to a "non-tipped employee" under the FLSA. Therefore, the fact that the toke pool sometimes includes dealers who are not working on a particular day due to scheduled PTO does not invalidate the tip pool, as a matter of law.

---

[8] Hourly table games dealers at Hollywood Casino operate various table games, which includes dealing cards to customers, playing hands on behalf of the casino, determining winners, and exchanging money for chips, among other duties that involve constant interaction with customers.

2.      **Hollywood Casino does not arbitrarily deny participation in the tip pool by PTO users, but rather follows a standard, well-known policy.**

Plaintiff's second theory in support of her FLSA claim is that Hollywood Casino "arbitrarily" denies a portion of the tip pool funds to those employees who do not provide adequate advance notice of their intention to use PTO. *See* Second Amended Complaint at ¶ 4, 98. Specifically, Plaintiff alleges that on one occasion in December 2017, she was denied PTO hours from the tip pool because she did not provide adequate advance notice under Hollywood Casino's PTO policy. *Id*. at ¶ 96-97. However, Plaintiff's second theory, like her previous effort, is also without factual or legal support.

As a preliminary matter, it must be noted that Plaintiff's two novel legal theories in support of her FLSA claim are entirely inconsistent with one another. On one hand, Plaintiff alleges that it was improper under the FLSA to distribute funds from the tip pool to employees using authorized PTO, as they are not employees who "customarily and regularly" receive tips. On the other hand, Plaintiff also asserts that funds from the tip pool ***should have been*** distributed even to those employees, such as Plaintiff, who failed to schedule their PTO with adequate notice. These two positions simply cannot be logically reconciled with one another, and Plaintiff admitted as much during her deposition. *See* **Exhibit 1** at 78-80 ("Taking the way you've said it, they – they are definitely inconsistent.").

Not only is Plaintiff's second legal theory logically inconsistent with her first theory, but it likewise is also completely unsupported by law. It is well established that tip pools can be mandatory, and an employer has the legal authority to determine what groups of employees will be included in the tip pool and how the tip pool will be distributed to the pool's participants. *See e.g.* 29 C.F.R. § 531.54 (a busboy, who performs an integral part of customer service without much direct interaction, may be included in a mandatory tip pool though he does receive tips

directly); *Dole v. Continental Cuisine, Inc.*, 751 F. Supp. 799, 800-01 (E.D. Ark. 1990) (upholding a mandatory tip pool that benefitted a maître d' who did not receive tips himself or contribute to the pool).

Where participation in a tip pool is mandatory, it can only include employees who customarily and regularly receive tips, and the employer must (1) notify the employees of any required contribution amount, (2) only take a tip credit for the amount each employee ultimately receives, and (3) not retain any of the employees' tips for any other purpose. 29 C.F.R. § 531.54. "Courts have interpreted this requirement to mean that an employer is not eligible to take the tip credit, and will be liable for reimbursing an employee the full minimum wage that employee would have earned, if the employer exercises control over a portion of the employee's tips." *Davis v. B & S, Inc.*, 38 F. Supp. 2d 707, 714 (N.D. Ind. 1998); *see also Kubiak v. S.W. Cowboy, Inc.*, 164 F. Supp. 3d 1344, 1362 (no violation where there was no evidence that Defendants ever exercised control over the tips).

Further, tip pools in which the employer mandates that some employees receive money from the pool without contributing to it are entirely proper under the FLSA. *See Kilgore v. Outback Steakhouse of Florida*, 160 F.3d 294, 301-02 (6th Cir. 1998) (upholding a tip pool in which certain employees derived their tip income solely from the tip pool; these employees were not allowed to take tips from customers and therefore had no tip income to contribute to the pool); *Dole v. Continental Cuisine, Inc.*, 751 F. Supp. 799, 800-01 (E.D. Ark. 1990) (upholding a mandatory tip pool that benefitted a maître d' who did not receive tips himself or contribute to the pool); 29 C.F.R. § 531.54 (a busboy, who performs an integral part of customer service without much direct interaction, may be included in a mandatory tip pool though he does receive tips directly). Just like an employer can require a busboy (who makes no tips directly) to be

included in the tip pool, Hollywood Casino can require only pre-approved PTO users to be included in its dealer tip pool.

More importantly, it is undisputed that Hollywood Casino does not exercise control over *any* of the tips received by the dealers, nor are *any* tips retained by Hollywood Casino for any other purpose, as required by 29 C.F.R. § 531.54. Rather, as described above, every cent of the daily tip pool is counted by the dealers participating in the tip pool and distributed to the dealers participating in the tip pool, all of whom are regularly tipped employees, pursuant to the standard formula described in Section I.C.3., *supra*.

In arguing that Hollywood Casino's tip pooling policy is somehow improper, Plaintiff improperly conflates an employer's right to exercise some control over the basic structure of the tip pool (which is permissible), with an employer's retention of employees' tips (which is not permissible). As described above, Hollywood Casino follows a simple and well-known policy that PTO must be scheduled in advance to be considered "scheduled PTO" such that the employee can participate in the toke pool for that gaming day. Hollywood Casino's policy is both reasonable and consistent with well-settled law. *See* 29 C.F.R. § 531.54 (proper for an employer to redistribute tips to employees in furtherance of a pooling arrangement); *Kubiak v. S.W. Cowboy, Inc.*, 164 F. Supp. 3d 1344, 1362 (no violation where there was no evidence that defendants ever exercised control over employees' tips). Here, just as explicitly permitted by 29 C.F.R. § 531.54, Hollywood Casino's policy distributes all tips to employees, including those on scheduled PTO, pursuant to a standard and well-known formula.

Furthermore, Plaintiff's repeated assertion that Hollywood Casino "arbitrarily" controls who will be approved for PTO, and thus included in the tip pool, has absolutely no factual support in the record. Plaintiff plainly admitted in her deposition that neither she, nor any other employee that she is aware of, has ever been denied Authorized PTO when it was requested in

accordance with the table games department's 14-day advance notice guideline.[9] Based on Plaintiff's own admissions, there simply is no factual dispute that Hollywood Casino follows its well-known PTO policy in a fair, equitable, and decidedly non-"arbitrary" manner.[10]

### B.    Plaintiff's Wage Payment and Collection Act Claim Fails as a Matter of Law.

Plaintiff's next cause of action, identified in the Second Amended Complaint as Count II, asserts that Hollywood Casino violated the provisions of the West Virginia Wage Payment and Collection Act ("WPCA"), W. Va. Code § 21-5-1 *et seq*. Specifically, Plaintiff alleges that "Defendants failed and/or refused to pay to the Plaintiff and the other similarly situated employees the wages owed to them under WPCA when they did not permit Dealers to retain all of their tips as required by Defendants' tip pool compensation policy." *See* Second Amended Complaint at ¶ 108. Because the WPCA regulates only the timing and form of the payment of wages to employees, and because Plaintiff is still employed by Hollywood Casino, her claims under the WPCA must be dismissed as a matter of law.

---

[9] Plaintiff testified as follows:

| | |
|---|---|
| Q. | . . . Have you ever been denied PTO when you requested at least – when you requested it at least 14 days or more in advance? |
| A. | Don't know. |
| Q. | Okay. Can you – as you sit here today, can you give me the name of a single person that you work with, that you're aware of, that has been denied PTO if they requested it 14 days or more in advance? |
| A. | In advance, no. |
| Q. | All right. |
| A. | Not that I know of. |

*Id*. at 95-96.

[10] Which is consistent with Hollywood Casino's Acceptance and Distribution of Tips Policy, which states, in relevant part:

In determining the number of hours which an employee has worked for purposes of tip pool distribution, ***Hollywood Casino may establish standards for distribution which include hours of*** vacation time, ***personal leave time***, or any other authorized leave of absence in the number of hours worked by each employee. ***Any such standards shall apply uniformly to all employees***.

1.    **The West Virginia Wage Payment and Collection Act does not regulate the amount of wages owed to employees, and is thus inapplicable to this case.**

The West Virginia Wage Payment and Collection Act governs the timing of wage payments to employees. It is separate and distinct from other statutes dealing with issues such as minimum wages and maximum hours. In other words, the WPCA does not require any particular **amount** of wages to be paid to employees – it merely governs **when** those payments must be made. *See e.g.* W. Va. Code § 21-5-3 (requiring semi-monthly payments of wages "with no more than nineteen days between settlements"); W. Va. Code § 21-5-4 (requiring employers to pay a discharged employee's final wages on or before the next regular payday on which the wages would otherwise be due and payable); *see also Gregory v. Forest River, Inc.*, 369 F. App'x 464, 469 (4th Cir. 2010) ("[T]he WPCA regulates the timing of payment of wages. However, it does not regulate the amount of wages, and it does not establish how or when wages are earned.") (citing *Saunders v. Tri-State Block Corp.*, 207 W. Va. 616 (2000)). Furthermore, damages under the WPCA, including liquidated damages totaling two times the untimely paid amount as demanded by Plaintiff in her Second Amended Complaint, are only available to an employee who was not timely paid final wages following the termination of his or her employment. *See* W. Va. Code § 21-5-4(e); *Atchison v. Novartis Pharmaceuticals Corp.*, 2012 U.S. Dist. LEXIS 33384 (S.D. W. Va. 2012) (WPCA provisions have clearly-defined remedies). In fact, the WPCA explicitly states that "[t]his section regulates the timing of wage payments upon separation from employment and not whether overtime pay is due. Liquidated damages that can be awarded under this section are not available to employees claiming they were misclassified as exempt from overtime under state and federal wage and hour laws." *Id.*; *see also Westfall v. Kendle Int'l, CPU LLC*, 2007 U.S. Dist. LEXIS 11304, *46 (dismissing the plaintiff's WPCA claim and holding that "[t]he FLSA creates the right to overtime and provides the exclusive

remedy for the recovery of such premium pay."). Similarly, damages related to an allegedly improper tip pool under the FLSA are simply not recoverable under the WPCA.

In this case, there is no factual dispute that Plaintiff is still an active employee of Hollywood Casino. *See* **Exhibit 1**, at 8. She has not been laid off, has not resigned, and has not been involuntarily terminated from her position. *Id*. Thus, Plaintiff is not eligible to recover any damages under § 21-5-4 of the WPCA. *See e.g. Walker v. West Publ. Corp.*, 2012 U.S. Dist. LEXIS 127365, *10 (S.D. W. Va. 2012) ("To argue that Plaintiff was due to be paid his wages and benefits [pursuant to the WPCA], as Plaintiff does here, Plaintiff would require the Court to make a finding that he was terminated."); *Conrad, et al. v. Charles Town Races, Inc.*, 206 W. Va. 45 (1998) (affirming dismissal of plaintiffs' claim that employer failed to pay former employees their wages pursuant to the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C.S. §§ 2101-2109, within time periods proscribed by the WPCA, and holding that the time limitations governing the payment of wages under the WPCA did not apply to back pay damages made pursuant to WARN, because the statutory remedial payments did not constitute wages as defined by the WPCA).

Plaintiff's Second Amended Complaint contains no allegations related to the *timing* of Hollywood Casino's payment of her wages – the only thing regulated by the WPCA. Because the WPCA does not regulate the *amount* of wages due to an employee, only the timing of such payments, Plaintiff's claim under the WPCA must be dismissed as a matter of law.

### 2. Hollywood Casino's tip pooling arrangement fully complies with West Virginia law.

Consistent with the analysis, *supra*, that the WPCA does not govern Plaintiff's claims in this case, it goes without saying that there is no provision within the West Virginia Wage Payment and Collection Act related in any way to tip pooling. Further, there is no case law from

the Supreme Court of Appeals of West Virginia addressing the requirements of a proper tip pooling arrangement under West Virginia state law, including under the West Virginia Wage Payment and Collection Act. In fact, the only reference to tip pooling under West Virginia state law can be found within the West Virginia Code of State Regulations at W. Va. C.S.R. § 42-8-12.1.7-8. Notably, and consistent with Hollywood Casino's argument that the WPCA does not apply in this case, these regulations were promulgated under the authority of the West Virginia Minimum Wage and Maximum Hours Standards Act, W. Va. Code § 21-5C-1 *et seq*. – **not** the WPCA.

Importantly, Plaintiff has not alleged any violations of West Virginia's Minimum Wage and Maximum Hours Standards Act or its implementing regulations in this case. However, even if such allegations had been raised, it is quite clear that Hollywood Casino's tip pooling arrangement is in full compliance with West Virginia law. The applicable sections of the West Virginia Code of State Regulations state as follows:

> **12.1.7.** If an employer taking a tip credit permits tip-sharing or tip pooling, the employer shall divide the shared or pooled tips among only service employees and dual job employees working as service employees, and shall ensure that the employees individually document the amount of tips paid out.

> **12.1.8.** An employer taking a tip credit shall not be entitled to receive any shared or pooled tips.

W. Va. C.S.R. § 42-8-12. There simply is no dispute that Hollywood Casino "divide[s] the shared or pooled tips among only service employees," and does not "receive any shared or pooled tips." As detailed extensively above, it is undisputed that only hourly table games dealers at Hollywood Casino participate in the tip pool, and Hollywood Casino does not receive a single penny from the tip pool. Accordingly, Hollywood Casino's tip pooling arrangement is in full compliance with applicable West Virginia law. Plaintiff's WPCA claim (Count II of her Second

19

Amended Complaint), which clearly does not apply to the facts of this case, must be dismissed as a matter of law.

**C.    Plaintiff's Breach of Contract Claim Fails as a Matter of Law.**

Plaintiff's final cause of action, identified in the Second Amended Complaint as Count I, asserts a claim for breach of contract against Hollywood Casino under West Virginia common law. Specifically, Plaintiff's Second Amended Complaint alleges that "Defendants provided compensation and Plaintiffs provided labor as mutual consideration so as to convert Defendants' tip pool compensation policy into an enforceable contract that is and was binding on the Parties." *See* Second Amended Complaint at ¶ 102. Plaintiff further alleges that "Defendants breached their compensation contract with Plaintiff and the other similarly-situated employees when they failed and/or refused to pay to Plaintiff and the other similarly-situated employees the wages owed to them as required by Defendants' tip pool compensation policy contract."[11] *Id*. at ¶ 103.

Under West Virginia law, to sustain a claim for breach of contract, a plaintiff must prove the following: (1) the existence of a valid, enforceable contract; (2) that the plaintiff has performed under the contract; (3) that the defendant has breached or violated its duties or obligations under the contract; and (4) that the plaintiff has been injured as a result. *See e.g. Nance v. Huntington W. Va. Hous. Auth.*, No. 16-0855, 2017 W. Va. LEXIS 345, *13 (memorandum opinion); *Exec. Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.*, 681 F. Supp. 2d 694, 730 (S.D. W. Va. July 30, 2009); *see also Marshall v. Elmo Greer & Sons, Inc.*, 193 W. Va. 427, 430 (1995) (per curiam) ("An implied contract presupposes an obligation arising from mutual agreement and intent to promise but where the agreement and promise have not been expressed in words.") (internal quotations omitted). The elements of a contract are an offer

---

[11] It is ironic that, on the one hand, Plaintiff claims that the absence of a term providing for a toke distribution for unscheduled PTO renders the Toke Policy illegal while, on the other hand, claiming that Hollywood Casino breached the Toke Policy by not providing a toke distribution for unscheduled PTO (a provision that Plaintiff admits does not exist in the Toke Policy).

and an acceptance supported by consideration. *First National Bank of Gallipolis v. Marietta Manufacturing Co.*, 151 W. Va. 636, 642 (1967). Consideration is "some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by another." *Id*. Consideration is "an essential element of, and is necessary to the enforceability or validity of a contract." *Id*.

First, Plaintiff completely fails to demonstrate any evidence supporting the existence of a valid, enforceable contract between the parties related to the payment of PTO hours out of Hollywood Casino's tip pool. *See e.g. Younker v. Eastern Associated Coal Corp.*, 214 W. Va. 696 (2003) (holding that an employer's code of business conduct and other similar policy manuals do not create a contract of employment). However, even assuming there was a valid contract between the parties, that contract would take the form of Hollywood Casino's tip pooling policy, and there is no dispute that Plaintiff was fully aware of that policy and accepted its benefits for nearly eight years without complaint. Under those circumstances, it is ludicrous for Plaintiff to now claim that Hollywood Casino breached some other "contract" it had with Plaintiff. As discussed above, Plaintiff admitted in her deposition that, with regard to the inclusion of PTO hours into the tip pool distribution calculation, she was aware of – and frequently used and appreciated this benefit:

> Q.    . . .  And you told me that in the seven and a half years you've worked there, you've taken roughly 70 PTO days. Do you remember that?
> A.    Yes.
> Q.    Okay. And that was a benefit to you; was it not?
> A.    Yes.
> Q.    Okay. That meant you could take vacation or time off and still get paid something; correct?
> A.    Correct.
> Q.    Now, you understand that Hollywood Casino, if you're not working, has no obligation to pay you anything, right?
> A.    Right.
> . . .

> Q.     All right. And then in addition to that hourly rate, if you schedule the PTO in advance, you also get an additional $10 an hour in terms of participation . . . in the toke pool; correct?
>
> A.     Correct.
>
> Q.     And that is also a benefit to you; right?
>
> A.     Correct.
>
> Q.     And if you were not able to participate in the toke pool that day, that meant that instead of getting in the neighborhood of 15 to $16 an hour for your PTO, you could theoretically be paid nothing; true?
>
> A.     True.
>
> . . .
>
> Q.     Okay. And my question is: Because you are on scheduled PTO, that is a benefit to you that day, because you can take that time off and still have a stream of income; correct?
>
> A.     Correct.
>
> Q.     Okay. And that's a good thing for you; right?
>
> A.     It's good.

*Id*. at 50-54. Tellingly, Plaintiff also admitted that, prior to the filing of this lawsuit, she never complained to anyone at Hollywood Casino about including PTO hours into the tip pool distribution.

> Q.     All right. Prior to filing the lawsuit for which we are here today, did you ever go to anybody at Hollywood Casino and say that it was illegal or improper for them to pay you that $10-an-hour flat rate out of the toke pool for the gaming day on which you had PTO?
>
> A.     No.
>
> . . .
>
> Q.     . . . You would agree with me that the first time you ever made a complaint of any kind about this PTO issue was when you filed the litigation we're here for today; correct?
>
> A.     Yes.
>
> Q.     All right. And in the interim period of time between when you started working and filed this lawsuit, you accepted those benefits without complaint. You would also agree with that; wouldn't you?
>
> A.     Yes.

*Id*. at 55, 57.

Plaintiff also admitted in her deposition that neither she, nor any other employee that she is aware of, was ever denied PTO hours from the tip pool when it was requested in accordance with Hollywood Casino's policies. *Id*. at 95-96. It is patently absurd for Plaintiff to accept this

benefit, without complaint, roughly 70 times over a period of nearly eight years, and now claim that Hollywood Casino breached a "contract" by providing her with that very benefit.

Clearly, there is no breach of any "contract" (assuming one exists), nor any injury to the Plaintiff, under the circumstance of this case. Consequently, the Court should dismiss Plaintiff's breach of contract claim (Count I of her Second Amended Complaint) as a matter of law.

## IV.        CONCLUSION

For all the foregoing reasons, Defendants Penn National Gaming, Inc. and PNGI Charles Town Gaming, LLC d/b/a Hollywood Casino at Charles Town Races respectfully request that this Court grant their Motion for Summary Judgment on all claims, dismiss this case with prejudice, and grant them such further relief as it sees fit, including their reasonable fees and costs.

Dated: December 21, 2018                    Respectfully submitted,

                                            **PENN NATIONAL GAMING, INC. and**
                                            **PNGI CHARLES TOWN GAMING, LLC**

                                            **BY:    LITTLER MENDELSON, P.C.**

                                            */s/   Richard M. Wallace*
                                            Richard M. Wallace (WV State Bar No. 9980)
                                            rwallace@littler.com
                                            J. Todd Bergstrom (WV State Bar No. 11385)
                                            tbergstrom@littler.com
                                            Chase Tower
                                            707 Virginia Street East, Suite 1010
                                            Charleston, WV 25301
                                            304.599.4628
                                            304.599.4650 (fax)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

LINDA BARRICK, et al.

        Plaintiffs,

    v.

PENN NATIONAL GAMING, INC. and
PNGI CHARLES TOWN GAMING, LLC
d/b/a HOLLYWOOD CASINO AT CHARLES
TOWN RACES,

        Defendants.

Civil Action No. 3:17-CV-138
Judge Groh

## CERTIFICATE OF SERVICE

I, Richard M. Wallace, counsel for Defendants, Penn National Gaming, Inc. and PNGI Charles Town Gaming, LLC d/b/a Hollywood Casino at Charles Town Races, certify that on December 21, 2018, the foregoing ***Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment*** was served and filed using the ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon the following counsel of record:

Garry G. Geffert, Esquire
114 S. Maple Ave.
P.O. Box 2281
Martinsburg, WV 25402

Nicholas W. Woodfield, Esquire (admitted *pro hac vice*)
R. Scott Oswald, Esquire (admitted *pro hac vice*)
The Employment Law Group, P.C.
888 17th Street, N.W., 9th Floor
Washington, D.C. 20006

*/s/ Richard M. Wallace*
Richard M. Wallace (WV State Bar No. 9980)

FIRMWIDE:160803572.3 047363.1098